Filed 5/30/24  In re L.U. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.U., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082252 |
| Plaintiff and Respondent, | (Super. Ct. No. INJ2100009) |
| v. | OPINION |
| C.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Conditionally affirmed and

remanded with directions.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and

Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy

County Counsels, for Plaintiff and Respondent.

1

I.

INTRODUCTION

C.M. (Mother) appeals from the juvenile court's order terminating parental rights as to her three-year-old daughter L.U.[1] Mother contends the beneficial parental relationship exception to the termination of parental rights under Welfare and Institutions Code[2] section 366.26, subdivision (c)(1)(B)(i) applied to this case and thus juvenile court erred in terminating her parental rights. She also argues that the juvenile court and the Riverside County Department of Public Social Services (DPSS) failed to comply with the Indian Child Welfare Act of 1978 (ICWA)[3] (25 U.S.C. § 1901 et seq.) and related state law.

We conditionally affirm the juvenile court's order terminating parental rights. Mother fails to establish the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) applied in the present matter. We agree, however, that there was prejudicial error under ICWA and related California law and remand for compliance with the inquiry provisions of those laws.

---

[1] C.U. (Father) is not a party to this appeal.

[2] All future statutory references are to the Welfare and Institutions Code.

[3] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

2

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father have one child, L.U. Father is a registered sex offender, is on parole, and cannot have any contact with his child.[4] The family came to the attention of DPSS on January 5, 2021, with allegations of general neglect and caretaker absence/incapacity. On this date, Father had called his parole agent to help him check on then one-month-old L.U. because Mother had been drinking alcohol and was a "'raging alcoholic,'" who drank during the pregnancy. When the parole agent accompanied Father to Mother's motel room, they discovered Mother to be severely intoxicated and stumbling in the room. There were empty alcohol bottles in the refrigerator and a vodka bottle in the freezer. L.U. was on the bed dressed only in a diaper. The paternal grandmother came and took L.U. The paternal grandparents were unable to provide for L.U. long term. The paternal grandmother stated that she had no Native American ancestry.

Mother had pending charges for child endangerment in Santa Barbara and an open dependency referral for general neglect after she was found in a motel room intoxicated when L.U. was 12 days old. She had been in a recovery program, but left after 30 days, and then arrived in Palm Desert on January 4, 2021. According to Father, Mother was a belligerent alcoholic and would drink until she passed out. Mother had participated in six

---

[4] "SCT" refers to the clerk's transcript from a prior appeal, which was dismissed, in case No. E076656. "SRT" will denote the reporter's transcript from case No. E076656.

to seven substance abuse programs and once spent nine months in an inpatient program. Father was not interested in any services for himself.

When the social worker interviewed Mother, the worker observed Mother to have a strong odor of alcohol. Initially, Mother denied drinking alcohol or having alcohol in the room, but then acknowledged a relapse. Mother declined voluntary services, claiming she did not have a drinking problem. Mother denied having any Native American ancestry. She also denied ever living on an Indian reservation/ Rancheria/community, attending school, or receiving services from a tribe or services available to Native Americans provided by the Federal government, such as Indian Health Services.

On January 6, 2021, the social worker provided the paternal grandmother with a copy of the protective custody warrant, and L.U. was taken into protective custody. L.U. was placed into a foster home.

On January 8, 2021, DPSS filed a petition on behalf of L.U. pursuant to section 300, subdivision (b)(1) (failure to protect). The petition noted that ICWA may apply as Father reported having Native American ancestry through the Iroquois tribe or "'Mohawk' tribe." Father claimed he was half Mohawk and that he was adopted by J.H. (the paternal grandmother) and W.U. (the paternal grandfather). Father denied ever living on an Indian reservation/Rancheria/community, attending school or receiving services from a tribe or services available to Native Americans provided by the Federal government, such as Indian Health Services.

4

On January 11, 2021, Mother filed an ICWA-020 Parental Notification of Indian Status form (ICWA-020) indicating she had no Native American ancestry as far as she knew. On this same date, Father also filed an ICWA-020 form, none of the options on the form applied. Specifically, Father did not check the boxes stating the child is or may be a member of, or eligible for membership in, a federally recognized Indian tribe; one or more of his parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe; he or the child are a resident of or domiciled on a reservation, rancheria, Alaska Native village, or other tribal trust land; and the child is or has been a ward of a tribal court.

The detention hearing was held on January 11, 2021. Mother and Father were both present in court. Father's counsel informed the juvenile court that Father's birth mother may have Native American ancestry, but that Father changed his name and has had no contact with his birth mother. Father informed the court that he was adopted at birth. The court ordered Father to be interviewed by the ICWA social worker to make sure they received all of the information. The court made temporary detention findings, ordered Father to cooperate with the ICWA social worker, recalled and quashed the protective custody warrant, and continued the matter for a contested detention hearing. The court did not inquire of Mother whether she had Native American ancestry.

5

The contested detention hearing was held on January 13, 2021. Both parents were present in court. The court noted that it had "already recalled and quashed the protective custody warrant," found Father to be the presumed father of L.U., and that ICWA may apply. CFS's counsel noted that the social worker's report indicated that Father may be Iroquois. Father's counsel clarified that it was actually "Mohawk," and Father confirmed this by stating, "Yeah, it's Mohawk." Father also stated, "I have no idea how much or anything else. I don't even know 100 percent it's true. It's -- it was a declaration by my biological mother, who's got some addictions to meth issues and I don't -- I have an estranged relationship with her." The court explained the law required them to follow up and investigate and ordered DPSS to provide "notice to the identified tribe, and/or Bureau of Indian Affairs (BIA), as required by law" and file proof of such notice with the Court. The court formally detained L.U. and provided Mother with visitation twice per week for one hour.

On January 28, 2021, Mother denied having any Native American ancestry. Father reported that he had been adopted. He had attempted to call his biological mother to inquire about possible Native American ancestry, but he "kept getting the run-around and she could not give him a straight answer." Father stated that if he did have Native American ancestry, it would be with the "'Iroquois tribe and they don't recognize anyone who is less than 50 [percent].'" He noted that he had spoken to his attorney and realized he did not have Native American ancestry, and that was why he completed the ICWA-020 form stating that he had no such ancestry. When the social worker asked Father for

6

his biological mother's telephone number to inquire about possible Native American ancestry, Father declined to provide the social worker with her telephone number and said he did not want her involved.

Mother denied the allegations in the petition and reported only drinking one time during her pregnancy. However, Father's parole officer informed the social worker that Mother drank throughout her pregnancy. The maternal grandfather believed Mother was addicted to alcohol and often required medical care. In addition, Mother had numerous psychological holds since high school. He noted Mother began using alcohol at age 13, had been heavily addicted to alcohol, had been to the emergency room over 15 times due to her alcohol abuse, and often became abusive and illogical in her thinking due to her alcohol addiction.

The maternal grandfather indicated that he and the maternal grandmother were willing to provide care for L.U. and requested to be assessed for placement. Mother stated that she was comfortable with L.U.'s foster home. She did not want any of her family involved and did not want them to be assessed for placement.

On February 4, 2021, Mother requested a contested hearing and the juvenile court continued the matter. At that time, the court found that ICWA did not apply based "upon everything" the court had "read and considered."

On February 17, 2021, Mother informed the social worker that she had entered an inpatient drug treatment program at MFI Recovery Center and that she wanted L.U. placed with her as the program allowed children. Mother also stated that she was participating in parenting classes, an outpatient substance abuse program, and therapy. Mother regularly visited L.U. and was appropriate, nurturing, attentive, and loving towards the child. She fed L.U. and changed her diaper.

The contested jurisdictional/dispositional hearing was held on March 2, 2021. Mother was present telephonically, and Father was present in court. The court found that ICWA did not apply and that L.U. was not an Indian child. The court found true the allegations in the petition, declared L.U. a dependent of the court, provided Mother with reunification services and denied services to Father.[5]

Due to Mother's compliance with her case plan, which included a substance abuse program, parenting classes, and individual counseling, on June 22, 2021, then eight-month-old L.U. was returned to Mother's care on family maintenance services. Mother's home was clean and free of safety threats and hazards. She had provisions for L.U., such as organic food, age-appropriate toys, diapers, and clothes, and kept a daily schedule and journal. Mother was not working and stated that she was providing for herself and L.U. through her savings. She also asserted that she was a yoga instructor and owned a catering business. She denied any medical or mental concerns and claimed that she was "spiritually married" to Father. The social worker expressed some concern with L.U.'s

_____

[5] Mother subsequently appealed, but later withdrew the appeal.

development and wanted to rule out Fetal Alcohol Syndrome and recommended additional family maintenance services.

On July 22, 2021, Mother and Father both denied Native American ancestry. Mother was present at the August 19, 2021, six-month review hearing and requested the case be set for a contested hearing.

On September 1, 2021, Mother informed the social worker that she thought the case would be closed, so she canceled her breathalyzer testing and discontinued calling the substance abuse hotline. As such, she failed to test in August 2021.

The contested six-month review hearing was held on September 13, 2021. At that time, Mother withdrew her request for a contested hearing. The court found Mother's progress was substantial and ordered additional family maintenance services, including 80 hours of alcohol testing. The court also found that ICWA did not apply, a sufficient inquiry had been made, and there was no new information to indicate that ICWA may now apply.

On November 29, 2021, Mother and Father indicated that they had no Native American ancestry.

DPSS recommended the dependency be terminated with juvenile court custody orders. L.U., who was then one year old, was bonded with Mother. Mother supervised and cared for L.U., and L.U. looks for her Mother. L.U. had been meeting developmental milestones and was thriving in Mother's care. Mother had completed her case plan services. She completed an inpatient substance abuse program, aftercare, and mental

9

health services. However, Mother had "many 'no shows'" for random substance abuse testing.

By December 2021, it appeared that Mother had relapsed. On December 9, 2021, Mother invited the former foster mother over to her residence for breakfast. The foster mother believed Mother was intoxicated and exhibited slurred speech and had trouble standing. An officer responded to Mother's home and confirmed she was heavily intoxicated, with slurred speech, slow movements, and she smelled like alcohol. The officer was "'1000 [percent] sure [Mother] was drunk.'" However, because Mother was able to care for L.U., the officer did not arrest Mother.

Following an immediate response referral with allegations of general neglect, four hours later the social worker arrived at the home and found Mother to be coherent and able to engage in a conversation with the worker. The social worker did not observe any alcohol in the home. Mother denied the allegation she consumed alcohol and reported she was suffering from a medical condition related to menopause and that her medication caused her to have slurred speech and stumble. The maternal grandfather reported that Mother was falling asleep during a Facetime call on December 10, 2021. L.U. was detained pursuant to a protective custody warrant.

On December 14, 2021, DPSS filed a section 387 petition alleging the previous disposition of placement with Mother was not effective in protecting L.U. Specifically, the petition alleged Mother failed to benefit from services because she continued to abuse alcohol while caring for L.U. The social worker recommended L.U. be removed from Mother's care.

The following day, on December 15, 2021, the juvenile court formally detained L.U. from Mother and recalled the protective custody warrant. L.U. was placed in a foster home. Mother was present at the detention hearing on the supplemental petition and the juvenile court did not inquire of Mother whether she had Native American ancestry. Mother was provided with supervised visitation twice a week for a minimum of one hour. The court found that a sufficient ICWA inquiry had been conducted and that ICWA did not apply.

On December 23, 2021, Mother and Father indicated that they did not have any Native American ancestry. As to the allegations in the section 387 petition relating to her relapse, Mother reported experiencing excessive vaginal bleeding that began on December 5, 2021, and lasted six days. On December 9, 2021, Mother informed the social worker that she was weak and disoriented due to her medication. Mother denied alcohol consumption. According to the reporting party, Mother was consuming whiskey and claimed that her dependency case was closed. Mother did not test for substances on December 10, 2021. In addition, Mother was not allowed at one of L.U.'s medical appointments due to her threatening behavior. Mother had also threatened the resource

parents and the foster family agency and acted erratically during visits. Mother, however, was appropriate during visitation once she modified her behavior and had started an intensive outpatient substance abuse program.

At a hearing on January 5, 2022, the juvenile court ordered DPSS to conduct at least three 80-hour random alcohol tests of Mother. Mother missed her random drug test on December 27, 2021, and tested negative on January13, 2022, but her specimen was diluted. She tested negative on January 18, 2022. Mother attempted to test on January 21, 2022, but the clinic was closed.

The jurisdictional hearing on the section 387 petition was held on February 3, 2022. The court found true the allegations in the section 387 petition. A contested dispositional hearing was set.

Mother did not get along with the foster parents and sent text messages they did not approve of. Mother accused the foster parents of causing injuries to L.U. and failing to supervise her. Mother tested negative for substances at the end of January 2022 and beginning of February 2022. She completed a psychological evaluation. The examiner was "unconvinced" that Mother was drinking alcohol on December 9, 2021, and opined Mother would most likely benefit from services.

L.U. was assessed at 14 months and was found to be behind in fine motor skills and developmentally delayed. On April 25, 2022, L.U. was examined by a genetics specialist. The doctor indicated L.U. had facial features of Fetal Alcohol Syndrome. Mother and both grandmothers blamed the foster parents for L.U.'s delays.

12

On May 12, 2022, the juvenile court found that reasonable efforts were made to prevent the need for removal of L.U. from the home and adjudged her a dependent of the court. L.U. was formally removed from Mother's care, and Mother was provided with reunification services.

Mother participated in general counseling. She also submitted three negative tests in May 2022, and one in June 2022. Mother regularly visited L.U. twice per week, in her home, for two hours, supervised by DPSS. L.U. was excited to visit with Mother, and Mother was attentive, affectionate, and comforting to L.U. Mother provided healthy snacks, changed L.U.'s diaper, followed L.U. around, and kept her safe. Mother also played learning toys with L.U. and L.U. laughed and enjoyed interacting with Mother. In addition, Mother read L.U. books and promoted her speech and well-being. L.U. was observed to be bonded with Mother and did not want to leave at the end of visits. By June 2022, Mother's visits with L.U. progressed to unsupervised. Mother had demonstrated sobriety during the reporting period, and DPSS believed L.U. would be safe in Mother's care.

L.U. was on an extended visit with Mother while in the presence of the maternal grandmother in June 2022. Mother agreed to attend an appointment for L.U. via Zoom on June 22, 2022. However, Mother did not attend the appointment with L.U., had trouble signing on to the Zoom meeting, and appeared to be possibly intoxicated in L.U.'s presence. Due to this concern, law enforcement was called that evening. DPSS

13

learned that Mother was arrested for public intoxication on June 22, 2022. Mother was uncooperative with law enforcement, and a bottle of wine was found in the home.

The maternal grandmother informed the social worker that she had checked into a separate hotel room with L.U. to keep her safe, and that Mother was currently at home "'sleeping it off.'" When Mother learned that L.U. had been returned to her foster parents and the extended visit had ended, Mother was distraught and stated that she was going to kill herself. The social worker contacted law enforcement to conduct a wellness check on Mother. Law enforcement found Mother asleep on the bed with a "'gash'" on her head where it looked like she had fallen. Mother denied wanting to kill herself. Mother was arrested again on June 30, 2022, for public intoxication in Indio. DPSS also learned that Mother had been arrested for public intoxication on April 13, 2022, at a restaurant in Rancho Mirage.

On July 5, 2022, the juvenile court ordered Mother's visits to be supervised and instructed DPSS to file a section 388 petition. On July 8, 2022, DPSS filed a section 388 petition to terminate reunification services to Mother and a hearing was set.

Mother was referred to a higher level of care and prescribed medication to block her ability to drink alcohol. Mother submitted two negative tests in July 2022.

The 18-month review hearing was held on August 15, 2022. The juvenile court found ICWA did not apply, a sufficient inquiry had been made, and that there was no new information to indicate ICWA may now apply. The court terminated Mother's reunification services and reduced Mother's visits to once a month. As such, the court

14

granted DPSS's section 388 petition and set the matter for a section 366.26 hearing to determine a more permanent plan for L.U.

On September 27, 2022, Mother and Father denied having any Native American ancestry. On November 10, 2022, the juvenile court found ICWA did not apply, a sufficient inquiry had been made, and there was no new information to indicate ICWA may now apply.

On November 8, 2022, Mother filed a section 388 petition seeking reunification services or family maintenance services. Mother claimed that she had completed a 30-day program, which included parenting, self-esteem groups, women's issue groups, and addressed healthy relationships. She asserted that she had completed a 30-day program at Hacienda Valdez, was in sober living, seeing a psychiatrist, and taking medication to keep her from drinking. She noted that she had seven negative tests and was attending Alcoholics Anonymous (AA) meetings. The juvenile court denied Mother's section 388 petition to change the court order.

L.U. had been diagnosed with Fetal Alcohol Spectrum Disorder and Intellectual Disability. Mother consistently visited L.U. and was always very attentive to her needs. L.U. was observed to enjoy her time with Mother. Mother was arrested on November 18, 2022, for public intoxication and resisting arrest.

Both parents denied having any Native American ancestry on December 12, 2022. Father also denied having any Native American ancestry on January 23, 2023. On February 23, 2023, the juvenile court found ICWA did not apply to L.U., a sufficient

15

ICWA inquiry had been made, and that there was no new information to indicate ICWA may now apply.

On March 6, 2023, L.U. was transported to Tennessee for a special visit with non-related extended family members (NREFMs). L.U. was officially placed with her NREFMs on March 15, 2023. The NREFMs expressed a desire to adopt L.U. After being placed in Tennessee, Mother regularly visited L.U. on a monthly basis via Zoom. Mother was enthusiastic during the virtual visits and encouraged L.U. as she completed activities, such as coloring or playing.

L.U. improved tremendously with her cognitive and physical levels after being placed with the NREFMs (prospective adoptive parents). L.U. no longer struggled when she walked or spoke, and she was learning new things every day. She looked happy, interactive, affectionate, and safe in her environment. L.U. was building a strong bond with the prospective adoptive family, and the prospective adoptive parents' children considered L.U. to be their sibling. The prospective adoptive parents were committed to adopting L.U. and raising her into adulthood.

On June 2, 2023, both parents again denied having any Native American ancestry. On June 22, 2023, the juvenile court found that ICWA did not apply to L.U., a sufficient inquiry had been made, and that there was no new information to indicate ICWA may now apply.

Mother was again arrested in July 2023 for substance-related issues. On September 5, 2023, the parents again reported that they had no Native American ancestry in their families.

The section 366.26 hearing was held on September 27, 2023. Mother was not present in court. Mother's counsel stated that she had not had contact with Mother, requested a continuance, and objected to the termination of parental rights on behalf of Mother. Mother's counsel did not raise the beneficial parental relationship exception to the termination of parental rights. The court denied Mother's request to continue the matter. The court found ICWA did not apply, a sufficient inquiry had been made, and that there was no new information to indicate that ICWA may now apply. The court found it was likely L.U. would be adopted, noting the child "is quite young and is in a placement that is prepared to move forward with the adoption," and terminated parental rights. Mother timely appealed.

III.

DISCUSSION

A. *Beneficial Parental Relationship Exception*

Mother contends the beneficial parental relationship exception to the termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) applied to this case, and therefore the juvenile court erred in terminating her parental rights. DPSS argues Mother forfeited the issue on appeal for failing to raise it below, and further asserts that even if we consider Mother's argument on the merits, the exception does not apply. We find Mother forfeited

17

this issue, and alternatively, find the juvenile court did not abuse its discretion in not applying the beneficial relationship exception.

### 1. General Legal Principles

When a juvenile court cannot safely return a child to a parent's custody, the court must set a permanency planning hearing under section 366.26. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'"[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care." [Citation.] At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors. [Citations.]' [Citation.] Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).)" (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 205-206; see *Caden C.*, *supra*, at p. 631 [under § 366.26, adoption is "the norm"].)

Section 366.26, subdivision (c) states several exceptions to this rule. Relevant here, the beneficial relationship exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [¶] . . . [t]he parents hav[ing] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

*Caden C.* clarified that a parent must prove three elements for the beneficial relationship exception to apply. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) Specifically, a

parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at p. 636.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

When the parent has met that burden, "it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C*., *supra*, 11 Cal.5th at pp. 636-637.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Id*. at p. 633.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid*.)

## 2. Forfeiture

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 961-962; accord, *In re Maria Q.* (2018) 28 Cal.App.5th 577, 590 ["'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.'"].) Moreover, "[g]eneral objections are insufficient to preserve issues for review. [Citation.] The objection must state the ground or grounds upon which the objection is based." (*In re E.A.* (2012) 209 Cal.App.4th 787, 790; accord, *In re Daniel B.* (2014) 231 Cal.App.4th 663, 672.) "'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.'" (*In re Daniel B.*, *supra*, at p. 672.)

It is the parent's burden to raise any applicable exception to the preferred plan of adoption during the section 366.26 hearing. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 403 (*Erik P.*) [parent's burden to raise any relevant exception at the selection and implementation hearing]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) The failure to raise an exception forfeits the issue on appeal. (*Erik P.*, *supra*, at p. 403; *In re S.B.*, *supra*, 32 Cal.4th at p. 1293 [dependency matters are not exempt from forfeiture rule].)

Application of the beneficial parental relationship exception depends entirely on a detailed analysis of the relevant facts by the juvenile court. As *Autumn H.* explains, the beneficial parental relationship exception "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.) Thus, the applicability of the exception is not a pure question of law. (*Erik P.*, *supra*, 104 Cal.App.4th at p. 403 ["If a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence."].) In addition, "[t]he juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 ; see *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252 [no sua sponte duty to raise beneficial parental relationship exception to adoption]; *In re Daisy D.* (2006) 144 Cal.App.4th 287, 291-292 [no sua sponte duty to raise sibling relationship exception to adoption]; *Erik P.*, *supra*, 104 Cal.App.4th at p. 402 [same].)

21

Here, Mother failed to raise the beneficial parental relationship exception to adoption at the section 366.26 hearing. Because she failed to raise the exception, the juvenile court did not have the ability to evaluate the critical facts and make the necessary findings. (*Erik P.*, *supra*, 104 Cal.App.4th at p. 403.) As such, a sufficient factual record has not been established from which we can determine whether the juvenile court's determination is supported by substantial evidence or whether the court abused its discretion when it did not apply the exception. (*Ibid.*) Accordingly, we find Mother forfeited this issue on appeal.

### 3. Assuming No Forfeiture

Even if Mother had not forfeited this issue on appeal, we find the juvenile court did not err in not applying the beneficial parental relationship exception to the termination of parental rights. As noted above, under *Caden C.*, *supra*, 11 Cal.5th at p. 631, for the beneficial relationship exception to apply a parent must show by a preponderance of the evidence (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at p. 636.) We review the first two elements or prongs of the test for substantial evidence. (*Id.* at p. 640; see *In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

As to the third element, "[t]he court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when "'"""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."'" [Citation.] But ""'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" [Citations.]" (*Id.* at p. 641.)

Even assuming that the record shows Mother satisfied the first two requirements of the beneficial relationship exception under *Caden C.* (regular visitation and a substantial emotional attachment), Mother cannot show the court abused its discretion in not applying the exception. Specifically, the court could ""'""reasonably . . . deduce[] from [the record]'"""" that severing even a substantial emotional attachment with Mother would not be detrimental to L.U. when considered in the larger context of the benefits to the child from being legally adopted by her current caregivers. (*Caden C.*, *supra*, 11 Cal.5th at p. 641 [no abuse of discretion when court's conclusion reflects one of ""'""two or more inferences [that] can reasonably be deduced from the facts'"""].)

Mother identifies nothing in the record that would prevent the court from reasonably concluding the many benefits of allowing L.U. to find a permanent adoptive home with caregivers with whom the child also shared a bond outweighed any detriment from severing Mother's relationship with L.U. L.U. was first detained when she was one month old, and she was placed in foster care from January 6, 2021, to June 22, 2021, when she was then reunified with her Mother. L.U. was again removed from Mother and placed back in foster care on December 10, 2021. L.U. was eventually placed with her caregivers in Tennessee on March 6, 2023. L.U. was thriving with her caregivers and her caregivers were committed to adopting L.U. At the time of the section 366.26 hearing, L.U. was almost four years old, L.U.'s relationship with Mother consisted of monthly video chats with Mother, and L.U. had spent almost her entire young life as a dependent of the juvenile court. The security of a new, permanent home outweighed any benefit L.U. had in maintaining a relationship with Mother.

Given this record, we cannot find an abuse of discretion.

B. *ICWA*

Mother argues DPSS failed to comply with the duty of initial and further inquiry required by ICWA because it did not ask the paternal grandmother, maternal grandparents, and a maternal aunt who were all readily available about possible Indian ancestry. DPSS argues it was not required to conduct an initial inquiry as to extended family members because L.U. was initially taken into custody under a section 340 protective custody warrant. (§ 224.2, subd. (b).) Alternatively, DPSS argues any error in

24

failing to inquire of extended relatives was harmless and not prejudicial and that if DPSS erred, the matter should be conditionally reversed.

1. Governing Legal Principles

"ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. [Citation.] California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes." (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678 (*Ricky R.*); §§ 224-224.6; see *In re Abbigail A.* (2016) 1 Cal.5th 83, 91 ["persistent noncompliance with ICWA led the Legislature in 2006 to 'incorporate[] ICWA's requirements into California statutory law'"].) "An Indian child is any unmarried person under 18 who 'is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4); see § 224.1, subd. (b).)" (*Ricky R.*, *supra*, at p. 678.)

Typically, it "is not self-evident whether a child is an Indian child," so "both federal and state law mandate certain inquiries to be made in each case." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.) """"Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.] The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."""" [Citations.] 'State law, however, more broadly imposes on social

services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."'" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*); *Ricky R.*, *supra*, 82 Cal.App.5th at p. 678; *In re Isaiah W.* (2016) 1 Cal.5th 1, 14 ["juvenile court has an affirmative and continuing duty in all dependency proceedings to inquire into a child's Indian status"].) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, *supra*, at p. 566.)

The juvenile court must inquire at each party's first appearance, whether any participant in the proceeding "knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).) Part of the initial inquiry also includes requiring each party to complete the California Judicial Council form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).) In addition, when an agency takes a child into temporary custody, the agency must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child," and the reporting party whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Extended family members include adults who are the child's stepparents,

26

grandparents, siblings, brothers-or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins.  (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

When the initial inquiry gives the juvenile court or the department "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), the court and social worker must conduct further inquiry to "determine whether there is reason to know a child is an Indian child." (§ 224.2, subd. (e)(2); see *In re J.S.* (2021) 62 Cal.App.5th 678, 686.)  The required further inquiry includes, but is not limited to: "(1) interviewing the parents and extended family members to gather [the] . . . information [required to include in notices sent under section 224.3]; (2) contacting the [BIA] and State Department of Social Services for assistance in identifying the tribes in which the child may be a member or eligible for membership in; and (3) contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership or eligibility." (*D.F.*, *supra*, 55 Cal.App.5th at pp. 566-567, fn. omitted; § 224.2, subd. (e)(2)(A)-(C); Cal. Rules of Court, rule 5.481(a)(4).)  The department "does not discharge their duty of further inquiry until they make a 'meaningful effort' to locate and interview extended family members and to contact BIA and the tribes.'" (*In re K.T.* (2022) 76 Cal.App.5th 732, 744.)  At this stage, contact with a tribe "shall, at a minimum," include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of ICWA notice, and "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).) There is "reason to

believe" a child involved in a proceeding is an Indian child whenever the court or social worker "has information *suggesting* that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1), amended by Stats. 2020, ch. 104, § 15, effective Sept. 18, 2020, italics added.)

Finally, if the further inquiry """"results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.""" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78; accord, *Ricky R.*, *supra*, 82 Cal.App.5th at p. 679 ["The duty to provide notice arises only if [the agency] or the court 'knows or has reason to know that an Indian child is involved.'"]; 25 U.S.C. § 1912(a); § 224.3, subd. (a).) Federal regulations define the grounds for reason to know that an Indian child is involved (25 C.F.R. § 23.107(c)(1)-(6)), and state law conforms to that definition (§ 224.2, subd. (d)(1)-(6)).)

"The juvenile court must determine whether proper notice was given under ICWA and whether ICWA applies to the proceedings. [Citation.]" (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.) """"If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."""" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.) A juvenile court finding that ICWA is inapplicable generally implies that the department and court have fulfilled their duty to inquire. (See *In re Austin J.* (2020) 47 Cal.App.5th 870, 885 [a finding that

28

"ICWA does not apply" implies social workers and court "did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry"].) We review ICWA findings for substantial evidence, but "where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051; see *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) "We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.*, *supra*, at p. 314.)

We apply a harmless error analysis to ICWA errors. (See *Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 743-744 [this court applied prejudice analysis when agency failed to conduct proper ICWA inquiry]; *In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1414-1415 [harmless error analysis to deficiencies in ICWA notice]; *In re D.W.* (2011) 193 Cal.App.4th 413, 418 [same]; *In re E.W.* (2009) 170 Cal.App.4th 396, 402-403 [same].) Any error in this case is one of state law, and requires reversal only upon a showing of prejudice. (*In re S.S.* (2022) 75 Cal.App.5th 575, 582.)

### 2. Duty of Initial Inquiry

Once a child is taken into temporary custody, DPSS must ask the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Specifically, section 224.2, subdivision (b), provides that, "[i]f a child is placed into the temporary custody of

a county welfare department pursuant to [s]ection 306," DPSS's obligation includes asking the "extended family members" about the child's Indian status.

Section 306 permits a social worker to take a child into temporary custody "without a warrant" in emergency situations, namely, when "the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety." (§ 306, subd. (a)(2).) Peace officers may also take children into temporary custody without a warrant when similar exigent circumstances exist (§§ 305, 305.6, subd. (a)), and section 306 also permits the social worker to take temporary custody of a child "who has been delivered by a peace officer." (§ 306, subd. (a)(1).)

By contrast, section 340 provides for the issuance of protective custody warrants, and on a weaker showing than is required for a warrantless detention under section 306. (§ 340, subd. (b)(2).) Specifically, section 340 authorizes the juvenile court to issue protective custody warrants when a section 300 petition has been filed and "the circumstances of [the minor's] home environment may endanger the health, person, or welfare of the minor, or whenever a dependent minor has run away from his or her court-ordered placement." (§ 340, subd. (a).) A court may also issue a protective custody warrant without a section 300 petition. (§ 340, subd. (b).)

In this court, there is split of authority on the question of when the duty to make ICWA-related inquiries under section 224.2, subdivision (b) arises. In three published

30

decisions, this court has concluded the duty to inquire of extended family members and others under section 224.2, subdivision (b) arises only when the child is placed into the temporary custody of a child welfare agency without a warrant. (*In re Robert F.* (2023) 90 Cal.App.5th 492, 499-503, review granted July 26, 2023, S279743 (*Robert F.*); *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-679, review granted July 26, 2023, S280572 (*Ja.O.*); *In re Andres R.* (2023) 94 Cal.App.5th 828, 846-848, review granted Nov. 15, 2023, S282054.)

In two other published decisions, this court has concluded that the duty to inquire under section 224.2, subdivision (b) applies in every case when a child is taken or placed into the temporary custody of the child welfare agency, regardless of how the child was taken into custody—with or without a warrant. (*In re Delila D.* (2023) 93 Cal.App.5th 953, 962 review granted Sept. 27, 2023, S281447 (*Delila D.*) ["[T]here is only one duty of initial inquiry, and that duty encompasses available extended family members no matter how the child is initially removed from home."]; *In re Samantha F.* (2024) 99 Cal.App.5th 1062, 1067 [accord].) To date, four other courts, in published decisions, have agreed with *Delila D.* (*In re C.L.* (2023) 96 Cal.App.5th 377 [Third Dist.]; *In re Jerry R.* (2023) 95 Cal.App.5th 388 [Fifth Dist.]; *In re V.C.* (2023) 95 Cal.App.5th 251 [First Dist., Div. Two]; *In re L.B.* (2023) 98 Cal.App.5th 512 [First Dist., Div. Four].) The question is under review in our Supreme Court, and *Ja.O.* is the lead case. (*In re Samantha F.*, *supra*, at p. 1068.)

In this case, we need not decide whether we agree with the reasoning of *Robert F.*,
*Ja.O.*, and *Andres R.*, or with the reasoning of *Delila D.* and *Samantha F.* because the
record is clear that the juvenile court failed to inquire about Mother under subdivisions
(c) of section 224.2.  That provision specifically provides, "[a]t the first appearance in
court of each party, the court shall ask each participant present in the hearing whether the
participant knows or has reason to know that the child is an Indian child.  The court shall
instruct the parties to inform the court if they subsequently receive information that
provides reason to know the child is an Indian child."  (§ 224.2, subd. (c).)

Our interpretation of section 224.2 does not exclude children removed pursuant to
warrants from ICWA inquiry.  Such children are still subject to the duty of initial inquiry
under subdivisions (a) and (c) of section 224.2.  They are also subject to the duty of
further inquiry under subdivision (e) of section 224.2 if there is reason to believe they are
Indian children.  (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 502-503, review granted; *Ja.O.*,
*supra*, 91 Cal.App.5th at pp. 680-681, review granted.)

### 3.  Duty of Further Inquiry

Contrary to DPSS's assertion, we agree with Mother that DPSS failed to conduct a
further inquiry into Father's extended relatives concerning his claims of Indian ancestry.
At the detention hearing, Father believed he had Indian ancestry through his biological
mother with either the Iroquois tribe or the Mohawk tribe, and the court ordered Father to
be interviewed by the ICWA social worker to make sure they received all of the
information.  At the jurisdictional hearing, the court explained to Father the law required

DPSS to follow up and investigate his claim of Native American ancestry and ordered DPSS to provide "notice to the identified tribe, and/or Bureau of Indian Affairs (BIA), as required by law" and file proof of such notice with the court.

Although the social worker interviewed Father concerning his claim of possible Native American ancestry, there is no indication the social worker inquired of the paternal grandparents concerning Father's claim. There is also no suggestion in the record that DPSS attempted to get Father's biological mother's contact information from the paternal grandparents when Father failed to provide such information to the social worker. Further, DPSS did not provide informal notice to the tribes or the BIA. Contact with a tribe must include, at a minimum, "'telephone, facsimile, or electronic mail contact to each tribe's designated agent' and include information 'necessary for the tribe to make a membership or eligibility determination.'" (*D.F.*, *supra*, 55 Cal.App.5th at p. 567; § 224.2, subd. (e)(3); Cal. Rules of Court, rule 5.481.)

"The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 430.) In addition, the department "has a duty 'to document it[s inquiry] and to provide clear information to the court' so the court may rule on the question of whether the ICWA applies." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 406 (*Josiah T.*); see Cal. Rules of Court, rule 5.481(a)(5) [the child welfare agency "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information

received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes"].)

The juvenile court also erred in failing to ensure DPSS complied with its duties of inquiry before finding ICWA did not apply. (See § 224.2, subd. (i)(2) ["the court may make a finding that [ICWA] does not apply to the proceedings" if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted"]; see also *In re Rylei S*. (2022) 81 Cal.App.5th 309, 320 ["[r]esponsibility for the errors and omissions here does not rest solely with the Department"; "[t]he juvenile court also erred in failing to ensure the Department had satisfied its duties of inquiry before finding ICWA did not apply to the proceedings"]; *In re Antonio R.*, *supra*, 76 Cal.App.5th at pp. 430, 432 [concluding the juvenile court failed to ensure the department complied with ICWA and related California law].)

Following the jurisdictional/dispositional report, DPSS's subsequent reports showed the parents repeatedly denying Native American ancestry. However, the reports contained no explanation for Father's later denials and provided no specifics regarding the inquiry made of the parents as to their Indian heritage, including whether they had been asked to explain or elaborate on Father's inconsistent responses. The record also does not indicate that DPSS ever contacted the maternal grandparents, the paternal grandfather, or the biological paternal grandmother—nor that it contacted the BIA or any Iroquois or Mohawk tribe—to ascertain whether L.U. is an Indian child. DPSS may not simply rely on a denial "when there is a conflict in the evidence and no supporting

34

information"; "a mere change in reporting, without more, is not an automatic ICWA free pass." (*Josiah T.*, *supra*, 71 Cal.App.5th at pp. 405-406 [paternal grandmother's statement she had Cherokee ancestry triggered the department's duty of further inquiry, which was not extinguished by her subsequent denial of Indian heritage in the absence of "any specifics regarding the inquiry"; "[w]ithout further information about what was asked and what was said, we cannot agree the single-sentence, unexplained denial . . . extinguished [the department's] reason to believe Josiah T. may be an Indian child"]; see also *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1167-1168 [concluding there was duty of further inquiry after the child's father filled out a form indicating the child's paternal grandfather was a member of a Cherokee tribe; although the social worker subsequently interviewed the father and reported that the father stated he did not have Indian heritage, the social worker's representation in the department's report did not provide specifics regarding the inquiry the social worker made of the father as to his Indian heritage].) On this record, DPSS's duty of further inquiry had not been extinguished, and the court thus erred in failing to ensure it had been satisfied. (See generally *Josiah T.*, *supra*, 71 Cal.App.5th at pp. 404-406; *In re Gabriel G.*, *supra*, at pp. 1167-1168.)

4. Harmless Error

DPSS concedes the record does not reflect the maternal grandparents and paternal grandfather were asked about Native American ancestry and that the social worker did not ask the paternal grandmother about the paternal biological grandmother. DPSS,

however, believes the error was harmless. We disagree.

The affirmative and ongoing duty of the department and the juvenile court to make ICWA inquiries and the department's specific obligation to ask extended family members about the child's Indian status are imposed by state, not federal, law. (§ 224.2, subds. (a), (b); Cal. Rules of Court, rule 5.481.) Accordingly, as previously noted, reversal is permitted only if we find the error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.)

We recognize our courts are divided on the question of what sort of failure of inquiry constitutes prejudicial error when a child services agency fails to comply with the inquiry provisions, and that our Supreme Court is poised to resolve the issue. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779-782, review granted, Sept. 21, 2022, S275578.) Unless and until our Supreme Court instructs otherwise, we will continue to follow our opinion in *Benjamin M.*, *supra*, 70 Cal.App.5th 735. There we adopted the view that a reviewing court must conditionally reverse a no-ICWA finding if the record demonstrates that the agency did not fulfill its initial duty of inquiry by asking readily available persons who might have helpful information likely to bear meaningfully upon whether a child is an Indian child. (*Benjamin M.*, *supra*, at p. 744; see *Josiah T.*, *supra*, 71 Cal.App.5th at p. 408 ["the court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [department's] inquiry that is not proper, adequate, or demonstrative of due diligence"].)

Here, the maternal grandparents and the paternal grandmother were involved in the proceedings, known to DPSS and readily available. In addition, a maternal aunt was present in court on July 5, 2022, with the maternal grandparents. It is unclear whether the paternal grandfather and the biological paternal grandmother were readily available to DPSS. However, DPSS could have inquired of the paternal grandmother as to their information. DPSS concedes that the maternal grandparents and the paternal grandmother were readily available, but contends Mother has not shown the information these relatives could have provided would bear meaningfully on the issue of whether L.U. is an Indian child. That does not mean, however, that it may choose not to interview readily available extended family members and others who have an interest in the child who may have potentially meaningful information on the theory there is no reason to believe that those persons would not yield any new information. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)

In *Benjamin M.*, we noted there that the Legislature placed the burden of making inquiry provisions and searching for evidence of Indian ancestry on the child services agencies, not the parent. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 743-745.) Moreover, ICWA's purpose is not limited to protecting the interests of Indian children and their families but encompasses as well the separate and distinct rights of the tribes to intervene in (or exercise jurisdiction over) a custody proceeding involving an Indian child. (25 U.S.C. §§ 1901, 1902, 1911; *In re Isaiah W.*, *supra*, 1 Cal.5th at pp. 7, 9; *Benjamin M.*, *supra*, at pp. 743-745.)

Naturally, a tribe cannot exercise its rights to intervene in a child custody proceeding if it does not have notice of it. And, for proper notice to be given, there must be an adequate investigation to determine whether the children who are the subject of the proceeding have or may have Indian ancestry. Compliance with the ongoing and affirmative duty of initial inquiry set forth in section 224.2, subdivisions (a) and (b), and California Rules of Court, rule 5.481 is crucial to that investigation. As we explained in *Benjamin M.*, though we cannot know what extended family members will say when interviewed by the department about a child's ancestry, their answers are likely to bear meaningfully on the question whether the child comes within ICWA. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744-745.) We cannot simply assume from the statements made by the parents that they are not aware of (or are simply denying) Native American ancestry that other extended family members or others who have an interest in the child will not have any useful information bearing on the subject. (*Id.* at pp. 742-743 [until the child services agency complies with its duty to gather information by conducting an initial inquiry, we cannot know what information an initial inquiry, properly conducted, might reveal].)

As stated in *In re Rylei*, *supra*, 81 Cal.App.5th 309, when, as here, "the errors were the Department's nearly complete failure to make the additional inquiries of extended family members . . . required by section 224.2, subdivision (b) (and, in this case, the inquiries under section 224.2, subdivision (e), as well)," the "missing information was, at the very least, likely to be meaningful in determining whether the

38

children involved were Indian children—whether the information ultimately showed they were or established they were not." (*In re Rylei*, *supra*, at p. 324.) "Because we do not know what we do not know, nothing more in the way of prejudice need be shown." (*Ibid.*) Proper and adequate inquiry—including under section 224.2, subdivision (c), and further inquiry under section 224.2, subdivision (e)—is required on remand.

## IV.

## DISPOSITION

The orders terminating parental rights are conditionally affirmed. The matter is remanded to the juvenile court for full compliance with the inquiry and, if applicable, the notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion. If the juvenile court determines that ICWA does not apply, then the court shall reinstate the orders. If the court determines that ICWA does apply, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>

J.

We concur:

<u>McKINSTER</u>

Acting P. J.

<u>RAPHAEL</u>

J.

39